PER CURIAM.
This case is before the Court on appeal from an order denying a motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.850. The order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, and, therefore, this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution.

Trial Court Proceedings

A jury convicted Joshua D. Nelson of robbery with a deadly weapon and the first-degree murder of Tommy Owens. See Nelson v. State, 748 So.2d 237, 240 (Fla.1999). The jury recommended death by a vote of twelve to zero. See id. The trial court followed the recommendation of the jury and sentenced Nelson to death for the first-degree murder conviction. See id. The trial court also sentenced Nelson to 189 months imprisonment for the robbery conviction. See id. In the opinion that affirmed the imposition of the death penalty, this Court detailed the following facts with regard to the murder of Owens:
Nelson and Keith Brennan wanted to leave the city of Cape Coral. The two devised a plan to murder Tommy Owens and steal his car. Nelson and Brennan knew that Owens kept a baseball bat in his car. On the evening of March 10, 1995, Owens was lured under false pretenses to a remote street. Nelson and *82 Brennan were able to convince Owens to exit his car, whereupon Nelson hit Ow-' ens with the bat. After a number of blows, Owens eventually fell to the ground. Nelson and Brennan tied Owens’ legs and arms. Owens pleaded for his life, stating that the two could take his car. After a brief discussion, Nelson and Brennan concluded that to avoid being caught, they should kill Owens. Brennan attempted to slice Owens’ throat with a box cutter. Owens was not unconscious when the attacks began and he begged Nelson to hit him again with the bat so as to knock him unconscious before the stabbing continued. Nelson did as Owens, requested and Brennan continued to attack Owens with the box cutter. Nelson and Brennan also continued to strike Owens a number of times with the bat. The two eventually dragged Owens’ body to nearby bushes, where Owens later died.
Nelson and Brennan picked up Tina Porth and Misty Porth and the four left the city in Owens’ car. After stopping in Daytona Beach, the four left the state and drove to New Jersey. At different times during the trip, Nelson and Brennan informed Tina and Misty that they had murdered Owens. Both Tina and Misty testified at trial.
Nelson and Brennan were apprehended by law enforcement officers in New Jersey. Nelson gave a video- and audio-taped confession. In the confession, Nelson detailed his account of the murder, both at the crime scene and at the place where the bat was recovered. The video-taped confession was played to the jury. Additionally, an analyst for the Florida Department of Law Enforcement testified that blood stains on Nelson’s shoes, the box cutter, and a pair of underwear that the box cutter was wrapped in all matched Owens’ DNA.
Id. at 239-40. This Court also outlined the recommendation of the jury to sentence Nelson to death, as well as the trial court’s consideration of the aggravating and mitigating circumstances that supported the sentence of death:
Nelson was found guilty of first-degree murder and robbery with a deadly weapon. At the penalty phase, the jury recommenced death by a twelve-zero vote. The trial court found three aggra-vators: (1) the murder was committed in the course of a robbery; (2) the murder was especially heinous, atrocious, or cruel (HAC); and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification (CCP). The trial court also found that one statutory mitigator (age of eighteen at the time of the crime) and fifteen nonstatutory miti-gators [n.1] were established. The statutory mitigator was given great weight. The first nonstatutory mitigator was given substantial weight, and the remaining nonstatutory mitigators were given from moderate to little weight. The trial court concluded that Nelson failed to establish the following statutory miti-gators: (1) that he acted under the effect of extreme emotional disturbance, (2) that he was an accomplice with minor participation, (3) that he acted under the domination of another person, and (4) that his capacity to appreciate the criminality of his conduct was impaired. The trial court followed the jury’s recommendation and imposed the death penalty for the first-degree murder conviction.
*83 Id. at 240 n. 1. Nelson raised the following claims on direct appeal:
(1) the trial court erred by failing to properly determine the admissibility of testimony by the State’s DNA expert Darren Esposito; (2) the trial court violated Nelson’s right to confrontation by admitting evidence of his nontestifying codefendant’s out-of-court statement; (3) the trial court failed to weigh Nelson’s history of substance abuse as a mitigator; (4) the trial court improperly found CCP; (5) the trial court improperly found HAC; (6) the trial court gave the jury a vague instruction on the HAC aggravator; and (7) the death sentence is disproportionate in this case.
Id. at 240. This Court denied relief on all claims and affirmed the convictions and sentences of Nelson. See id. at 240-46.

Postconviction Proceedings

In January 2001, Nelson, pursuant to Florida Rule of Criminal Procedure 3.850, filed a “shell” motion with the trial court in which he requested that the trial court vacate and set aside his convictions and sentences. In June 2009, Nelson filed a second amended motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, which included an integrated memorandum of law. The trial court replaced Nelson’s initial motion for postconviction relief with Nelson’s second amended motion for postconviction relief. In the second amended motion, Nelson claimed that trial counsel was ineffective, and that the life sentence of his codefen-dant, Keith Brennan, constituted newly discovered evidence that subjected his sentence to collateral attack.
The specific claims outlined in the second amended motion were that trial counsel were ineffective because they (1) failed to guarantee that a fair and impartial jury tried Nelson; (2) failed to present mitigating evidence of Nelson’s drug and substance abuse and mental health problems during the penalty phase; (3) failed to bring to the attention of the jury the nature and extent of the neglect and abuse, especially sexual abuse, which Nelson suffered as a child when they failed to present the testimony of Nelson’s mother and stepfather during the penalty phase; (4) failed to provide Nelson’s mental health expert with the information necessary to diagnose ADHD, Bipolar Disorder, and Adjustment Disorder with Anxiety, all of which Nelson purportedly suffered from at the time of the homicide; (5) failed to object and move for a mistrial when the State impermissibly appealed to the sympathy of the jury during closing arguments; (6) failed to ask the trial court to sequester the jury or at least to admonish the jury not to listen to, watch, or read media reports concerning Nelson’s case between the guilt and penalty phases, which led to juror encounters with media that pertained to a tattoo Nelson engraved on himself between the two phases of trial that read “natural born killer”; (7) failed to ensure that the trial court properly swore the jurors; and (8) the cumulative effect of the various acts and omissions by trial counsel constituted ineffective assistance of counsel. Finally, Nelson argued *84 that (9) the trial court should vacate his convictions and sentences due to the newly-discovered evidence that the State, in the case of codefendant Brennan, alleged that Brennan was more emotionally mature than Nelson, and Brennan received a life sentence.
After an evidentiary hearing, the trial court rendered a final order that denied the claims raised by Nelson in his postcon-viction motion. We affirm and hold that the postconviction court did not err when it denied postconviction relief because trial counsel was not ineffective and the life sentence of Brennan did not constitute newly discovered evidence.

Ineffective Assistance of Counsel

Ineffective assistance of trial counsel claims are governed by the United States Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires that a defendant satisfy the following two requirements:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted).
The Strickland test presents mixed questions of law and fact, which compels this Court to employ a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004). In a rule 3.850 motion,[1] a postconviction court is required to conduct an evidentiary hearing unless the motion and record conclusively demonstrate that the movant is not entitled to the requested relief, or the motion is legally insufficient. See Jacobs v. State, 880 So.2d 548, 553 (Fla.2004); see also Fla. R.Crim. P. 3.850(d). If the postconvietion court determines that a claim is facially sufficient, but decides to deny that claim based solely on the record, the postconviction court must attach to its order of denial the portions of the record that conclusively refute the claim. See Jacobs, 880 So.2d at 550.
The judicial scrutiny of the performance of counsel is highly deferential. See Pagan v. State, 29 So.3d 938, 949 (Fla.2009). This Court employs a strong presumption that the performance of trial counsel was effective. See id. The defendant carries the burden to overcome this presumption and the assumption that the challenged action was the product of sound trial strategy. See id.

Juror Claims

Nelson first claims that trial counsel was ineffective because they failed to ensure that Nelson received a verdict and recom *85 mended sentence from a fair and impartial jury. More specifically, Nelson contends that trial counsel were ineffective for failure to move to strike for cause the venire members who were allegedly pro-death penalty, for failure to retain juror Sankis on the jury panel, and for failure to utilize peremptory challenges to remove the allegedly pro-death penalty venire members. However, the postconviction court acted correctly when it summarily denied this claim without an evidentiary hearing because the record conclusively establishes that trial counsel were not ineffective.
Effective assistance of trial counsel includes a proficient attempt to empanel a competent and impartial jury through the proper utilization of voir dire, challenges to venire members for cause, and the proper employment of peremptory challenges to venire members. See, e.g., Green v. State, 975 So.2d 1090, 1104-05 (Fla.2008); Dufour v. State, 905 So.2d 42, 58-55 (Fla.2005); Johnson v. State, 921 So.2d 490, 503-04 (Fla.2005). The test for juror competency and impartiality is whether a given juror is capable of placing any bias or prejudice aside and is willing and able to render a verdict recommendation solely on the evidence presented at trial and the instructions on the law provided by the court. See Busby v. State, 894 So.2d 88, 95 (Fla.2004). If a juror does not possess such an impartial state of mind, it is the duty of trial counsel to ferret out that state of mind during voir dire and challenge the juror for cause. See, e.g., Dufour, 905 So.2d at 54-55. Even if trial counsel challenges a juror for cause due to a perceived lack of impartiality, the trial court is not required to excuse that juror if, upon further questioning, the court establishes that the juror is able to base his or her decision on the evidence presented and the trial court’s instructions on the law. See id. at 54. For example, jurors may withstand a cause challenge if they inform the court that they can impartially weigh the aggravating and mitigating factors established and, in light of the evidence presented, recommend an appropriate sentence based on that consideration. See Davis v. State, 859 So.2d 465, 474 (Fla.2008).
If the trial court denies a cause challenge, counsel may also remove a venire member through the utilization of a peremptory challenge. See Johnson, 921 So.2d at 503-04. However, the notion that a jury would have reached a different verdict if trial counsel had exercised peremptory challenges in a different manner is generally considered mere speculation that fails to rise to the level of prejudice needed to establish an ineffective assistance of trial counsel claim for which relief is granted. See id. It is a dubious proposition that a different use of peremptory challenges would have resulted in a more defense-friendly jury and verdict and sentencing recommendation. See id.
In this case, Nelson alleges that trial counsel were ineffective for the failure to convince the trial court to strike six venire members — three of whom served on the actual jury — who had an alleged predisposition in favor of the death penalty. Nelson contends that this ineffectiveness emanates from counsel’s failure to support the cause challenges with legal authority. However, the purported pro-death penalty jurors under full interrogation attested to the trial court that they could recommend a sentence based on the evidence presented and the trial court’s instructions on the law, and that they could weigh the aggravating and mitigating factors as they considered their recommended sentence. More specifically, when presented with ve-nire members who had an alleged predisposition in favor of the death penalty, trial counsel did in fact move to have all of *86 them stricken for cause. However, the initial questions to the jurors did not provide an explanation of Florida law and upon further questioning and proper explanation those venire members clearly confirmed that they could follow the law and consider the established aggravating and mitigating factors in their decision to recommend a sentence for Nelson. Trial counsel was, therefore, not ineffective for a failure to have the purported pro-death penalty venire members stricken for cause upon proper and full questioning.
Nelson also contends that trial counsel were ineffective because they failed to ensure that prospective juror Sankis served on the jury. The trial court excused prospective juror Sankis due to his clear and open adverse predisposition to the death penalty. This excusal was proper because juror Sankis was unable to place aside his personal aversion toward the death penalty and impartially recommend a sentence — even after trial counsel attempted to provide a reasonable justification for the imposition of the death penalty. See, e.g., Busby, 894 So.2d at 96 (“The trial court must excuse a prospective juror for cause if ‘any reasonable doubt’ exists regarding his ability to render an impartial judgment and recommendation as to punishment.”). Therefore, the trial court acted properly in excusing Sankis, and trial counsel were not ineffective in their attempts to retain him for the jury panel.
Nelson further contends that the postconviction court improperly concluded that trial counsel were not ineffective for their failure to exercise peremptory challenges for the three purported pro-death penalty jurors who survived cause challenges. Nelson, however, has not established how the failure of trial counsel to exercise peremptory challenges for the alleged pro-death penalty jurors prejudiced the outcome of his case. It is mere speculation that the use of peremptory challenges for those jurors would have resulted in a different, defense-friendly outcome. See Johnson, 921 So.2d at 503-04. Therefore, the postconviction court properly denied this claim.

Tattoo Media

Next, Nelson contends that the trial court erred when it denied his claim with regard to trial counsel’s failure to request that the trial court instruct the jury to ignore media coverage with regard to Nelson’s case at the end of the guilt phase, or sequester the jury between the guilt and penalty phases. In the time period between the guilt and penalty phases of Nelson’s trial, Nelson engraved on his skin a personal tattoo that read “natural born killer.” Some of the jurors were exposed to news media with regard to the tattoo.
Under the Strickland analysis, the failure of a defendant to establish either of its two requirements, deficient performance and prejudice, renders an ineffective assistance of counsel claim without merit. See Strickland, 466 U.S. at 697, 104 S.Ct. 2052 (authorizing courts to dispose of ineffectiveness claims after addressing only one prong of the analysis). When this Court conducts a Strickland analysis and evaluates the possible deficiency of trial counsel, we have a duty to discard from our perspective the distortion caused by hindsight and enter our decision based on an evaluation of the conduct of counsel from the perspective of counsel at the time of the alleged deficiency. See Henry v. State, 948 So.2d 609, 620 (Fla.2006).
Trial counsel is also not ineffective merely because another attorney may disagree with a strategic decision. See Occhicone v. State, 768 So.2d 1037, *87 1048 (Fla.2000). A strategic decision does not rise to the level of ineffective assistance of counsel “if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Id. Furthermore, the failure of trial counsel to present evidence does not materially affect the outcome of a trial, and is not prejudicial to a defendant, if that evidence is cumulative to evidence previously presented to the jury. See id. Moreover, when this Court has previously rejected a substantive claim on the merits, trial counsel is not ineffective because he or she failed to present the same meritless argument. See Melendez v. State, 612 So.2d 1366, 1369 (Fla.1992).
To ensure fairness in a capital case, section 921.141(1), Florida Statutes (2010), provides a trial court with the authority to remove a juror during the penalty phase and replace him or her with an alternate juror if that juror displays an “inability” to continue. See, e.g., Jennings v. State, 512 So.2d 169, 173 (Fla.1987). A juror is unable to continue if trial publicity has negated his or her impartiality. See Bolin v. State, 736 So.2d 1160, 1164 (Fla.1999). However, the mere existence of trial publicity does not automatically result in a presumption of partiality and unfairness of constitutional magnitude. See id. Rather, jurors are presumed impartial if they establish that they can set aside all preconceived opinions, and render a verdict and recommend a sentence based on the evidence presented in court. See id.
In this case, during the evidentia-ry hearing, trial counsel admitted that, in hindsight, maybe he should have requested an instruction at the end of the guilt phase with regard to unexpected media coverage that pertained to Nelson’s case. However, when viewed from the perspective of trial counsel at the end of the guilt phase, we hold that the performance of counsel was not deficient. As related by trial counsel, at the end of the guilt phase, trial counsel had no idea that Nelson would personally engrave a negative tattoo on his body and that the media would print or televise news stories concerning the tattoo that jurors would encounter. Trial counsel did not learn of the tattoo or any news stories until the day before the penalty phase. It is incredible to expect that any attorney could reasonably foresee and prepare for such irrational conduct by a client who was just convicted of first-degree murder and facing a possible death sentence. Under the circumstances of this case, performance of trial counsel—when viewed from a perspective free of hindsight—was not deficient. See Henry, 948 So.2d at 620.
Also, Nelson was not prejudiced by encounters with media coverage that concerned his tattoo as revealed during the subsequent actions of the trial court. As established during the evidentiary hearing, at the onset of the penalty phase, the trial court fully examined the possibility that some of the jurors may have been impacted by encounters with media coverage of Nelson’s tattoo. However, when interrogated by the trial court, the jurors in question responded that they could remain impartial and follow the law despite the news stories. Some of the jurors in question stated that they barely comprehended the news stories and that the stories did not affect their perspective of the case. This action by the trial court established that the news stories did not affect the impartiality of the jurors, and established that there was no prejudice to Nelson caused by trial counsel’s failure to request an instruction or sequestration.
Nelson further contends that trial counsel were ineffective for reaching an agreement with the State whereby the *88 State agreed to bypass the opportunity to present evidence with regard to the tattoo during the penalty phase in exchange for defense counsel withholding the production of additional testimony from Nelson regarding remorse, which was previously presented during the guilt phase by the testimony of Nelson. Although Nelson accepted this agreement, he contends that trial counsel were ineffective because his desire was to further testify with regard to his remorse during the penalty phase and, as a result of the agreement, he was unable to fulfill that desire.
However, the decision by trial counsel to enter into the agreement and withhold the testimony of Nelson during the penalty phase was a strategic decision and did not constitute ineffective assistance of counsel. As established during the evidentiary hearing, trial counsel entered into the agreement only after they weighed the possible prejudicial impact of evidence with regard to the tattoo against the value of the purported remorse testimony by Nelson. Trial counsel strategically decided to accept the agreement because Nelson had already stated his remorse during the guilt phase, and further testimony would have caused the jury to hear evidence with regard to Nelson’s “natural born killer” tattoo, which directly negated Nelson’s assertion of remorse. Trial counsel opined that evidence of the tattoo would have been extremely negative because, at the time of Nelson’s' trial, a violent movie entitled “Natural Born Killers” was extremely popular. Nelson also testified that he had a feeling of only “slight” remorse for his crime at the time of trial. Such a callous disposition, coupled with the especially negative evidence of Nelson’s tattoo, led trial counsel to make a reasonable, strategic decision to enter into the agreement with the State.

Witness Testimony

Lastly, Nelson contends that trial counsel were ineffective for their failure to present the testimony of Nelson’s mother and stepfather during the penalty phase, even though those two individuals absconded from trial and did not return. Nelson suggests that trial counsel were deficient because that testimony was critical for mitigation purposes and counsel should have located these individuals or subpoenaed them after they absconded. The testimony of the mother and stepfather was allegedly to be with regard to the dysfunctional upbringing of Nelson that included physical and sexual abuse by'the stepfather, as well as chronic drug and alcohol abuse by Nelson that began at an early age. However, after defense counsel made statements with regard to sexual abuse by the family during guilt-phase opening statements, the mother and stepfather, who were present, exited the courtroom and have not been found. They did not testify in this proceeding, rendering the nature of their testimony pure speculation.
With regard to an ineffective assistance of counsel claim, witness availability is integral to a movant’s allegations of prejudice. See Nelson v. State, 875 So.2d 579, 583 (Fla.2004).[2] When a witness is unavailable to testify, trial counsel is not automatically ineffective for his or her failure to present that witness. See White v. State, 964 So.2d 1278, 1286 (Fla.2007). In such instances, due to the unavailability of the witness, a defendant cannot establish deficient performance or prejudice. See Nelson, 875 So.2d at 583. There are many reasons for a witness’s unavailability, ranging from the assertion by the witness of his or her right to remain silent, or the inability to locate witnesses or serve them with a subpoena. *89 See id. n. 3. Furthermore, even if a witness was available to testify and counsel was deficient in not presenting his or her testimony during trial, counsel is not ineffective if that testimony would have been cumulative to other evidence presented, because such cumulative evidence removes a defendant’s ability to establish prejudice. See Darling v. State, 966 So.2d 366, 377 (Fla.2007). In a defendant’s postconviction motion, if he or she alleges that counsel was deficient for the failure to call a witness, he or she must establish that the witness was available to testify. See Nelson, 875 So.2d at 583.
In this case, trial counsel admitted during the evidentiary hearing that Nelson’s mother and stepfather were present at the beginning of trial, and that he intended to call them to testify with regard to the dysfunctional upbringing of Nelson. Trial counsel also testified that the mother and stepfather absconded from trial after counsel stated during the guilt-phase opening statement that he intended to present evidence with regard to the physical and sexual abuse that Nelson endured as a child at the hands of the stepfather. Trial counsel admittedly failed to locate the mother and stepfather and did not subpoena them to testify. This, however, did not constitute ineffective assistance of counsel because at the time that trial counsel intended to present testimony from the mother and stepfather—the penalty phase—the mother and stepfather had already absconded without the permission of trial counsel and were therefore unavailable to testify. That unavailability negated any deficient performance by counsel and Nelson has not established prejudice. See Nelson, 875 So.2d at 583.
In addition, even if counsel were deficient in their failure to locate or subpoena the mother and stepfather, the testimony of those witnesses during the penalty phase would have been cumulative to other evidence presented. More specifically, during the guilt phase, Nelson himself testified as to his dysfunctional upbringing that included physical and sexual abuse by his stepfather, as well as his chronic use of drugs and alcohol. During the penalty phase, a mental health expert and other members of Nelson’s family members presented the same evidence. Therefore, any additional testimony by the mother and stepfather with regard to the dysfunctional upbringing of Nelson would have been cumulative to other evidence presented. This negated Nelson’s claim that trial counsel were ineffective for their failure to locate or subpoena the mother and stepfather, as Nelson was unable to establish how the failure to subpoena the mother and stepfather prejudiced him. See Darling, 966 So.2d at 377.

Newly Discovered Evidence

The postconviction court properly denied the claim of Nelson that evidence with regard to the life sentence received by codefendant Brennan constituted newly discovered evidence that subjected his sentence to collateral attack.
To establish a claim of newly discovered evidence, he or she must present facts that were “unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence.” Scott v. Dugger, 604 So.2d 465, 468 (Fla.1992) (quoting Hallman v. State, 371 So.2d 482, 485 (Fla.1979)). Further, the “newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.” Id. (quoting Jones v. State, 591 So.2d 911, 915 (Fla.1991)).
In Scott, the defendant was convicted of first-degree murder and sentenced to death. See id. at 467. This Court af *90 firmed that sentence on direct appeal. See id. Subsequently, the trial court sentenced a codefendant, who also convicted of first-degree murder, to the penalty of death. See id. at 468. However, on appeal, this Court vacated the codefendant’s sentence and remanded for a new sentencing proceeding, which resulted in a life sentence for the codefendant. See id. Scott then filed a postconviction motion under rule 3.850 in which he alleged that the life sentence of the codefendant was newly discovered evidence. See id. Although the postconviction court denied the claim, this Court reversed that denial and vacated the death sentence of Scott. See id.
In its analysis, this Court concluded that the subsequent life sentence of the code-fendant and the circumstances that surrounded it constituted newly discovered evidence because the trial court did not impose the life sentence on the codefen-dant until after the defendant’s direct appeal. See id. at 468-69. Thus, the life sentence imposed on the codefendant was a fact that the defendant could neither have known about, nor diligently discovered at the time of the defendant’s trial. See id. at 468. This Court supported its decision with the fact that the defendant and codefendant had comparable criminal records, were about the same age, had similar low IQs, and had equal culpability in the homicide. See id. We held that we probably would have determined that the death sentence of the defendant was inappropriate if we had been presented the opportunity to factor in our review on direct appeal the life sentence of the codefendant. See id. at 469. The Court then vacated the death sentence of Scott and held that in a death case that involves codefendants of equal culpability, the death sentence of one codefendant is subject to collateral attack under rule 3.850 when the other codefendant receives a subsequent life sentence. See id.
In Farina v. State, 937 So.2d 612 (Fla. 2006), however, this Court limited the context in which a subsequent life sentence of an equally culpable codefendant constitutes newly discovered evidence that a defendant could utilize in a collateral attack on a death sentence. There, as in Scott, the defendant and codefendant were equally culpable and the codefendant received a life sentence subsequent to the affirmance of the defendant’s sentence of death. See id. at 619. The Court admitted that, normally, the life sentence of the codefendant would constitute newly discovered evidence for the defendant. See id. However, the Court held that the life sentence of the codefendant did not constitute newly discovered evidence because it reduced the sentence of the codefendant to life imprisonment because, as a matter of law, the codefendant was ineligible to receive the death penalty. See id. The Court noted that at the time of homicide, the eodefen-dant was sixteen years old, which rendered a sentence of death cruel and unusual punishment as a matter of law and death was not an option. See id. at 620. Therefore, because the life sentence of the codefen-dant did not pertain to the nature or circumstances of the crime, or the record or character of the defendant, but rather, pertained to the codefendant’s ineligibility as a matter of law due to age, the life sentence was not newly discovered evidence. See id.
Notably, in reaching our conclusion in Farina, the Court relied upon our decision with regard to Nelson’s codefendant, Keith Brennan. See id. In Brennan v. State, 754 So.2d 1 (Fla.1999), this Court held that Brennan — although as equally culpable as Nelson — was ineligible for the death penalty as a matter of law because he was sixteen years old at the time of the homi *91 cide, for which a sentence of death constituted cruel and unusual punishment under the Florida Constitution. See id. at 11.
In this case, the life sentence of Brennan as a matter of law does not constitute newly discovered evidence for Nelson because Brennan’s ineligibility for the 'death penalty stemmed from his ineligibility as a matter of law — not from the circumstances that surrounded the homicide or Brennan’s character and emotional maturity. Therefore, the trial court did not err when it denied Nelson’s claim that the life sentence of Brennan constituted newly discovered evidence.
Accordingly, we affirm the denial by the trial court of the postconviction claims raised by Nelson.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

N.1] The following nonstatutory miti-gators were presented during the penalty phase: (1) Nelson gave a voluntary confession, (2) Nelson was not the person who killed the victim, (3) death was caused by the codefendant Brennan, (4) Nelson suffered from a deprived childhood, (5) Nelson’s *83 childhood saddled him with emotional handicaps, (6) outside influences saddled Nelson with emotional handicaps, (7) Nelson suffered great situational stresses leading up to the time of the homicide, (8) Nelson was suffering emotional turmoil before and at the time of the homicide, (9) Nelson’s anger stems from circumstances beyond his control, (10) Nelson suffered physical, mental, and sexual family abuse, (11) Nelson has no prior criminal convictions for violent felonies, (12) the homicide was committed for emotional reasons, (13) there was a conditional guilty plea subject to a life sentence which was refused by the State, (14) Nelson has' potential for rehabilitation in prison, and (15) the death penalty as applied to Nelson is disproportionate.

. This case involves a motion filed pursuant to Florida Rules of Criminal Procedure 3.850, i.e., Nelson filed his motion before this Court created rule 3.851 on October 1, 2001. Therefore, rule 3.850 governs the motion. See Amendments to Fla. Rules of Crim. Pro. 3.851, 3.852, & 3.993, & Fla. Rule of Judicial Admin. 2.050, 797 So.2d 1213, 1221 (Fla. 2001); see also Taylor v. State, 62 So.3d 1101 (Fla.2011).

. This case involves a different defendant with the surname Nelson.